**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**


UNITED STATES OF AMERICA,
                Plaintiff,

v.                                          Cr. No. 10-2649 MCA

MATIAS BALDENEGRO,
                Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** is before the Court on *Defendant Matias Baldenegro's Motion to Suppress Evidence Seized In Violation Of The Fourth Amendment*, filed on November 17, 2010.  [Doc 26] On May 10, 2011, the Court held an evidentiary hearing on Defendant's *Motion*.  Having fully considered the pleadings of record, the applicable law, the evidence and arguments of counsel presented at the hearing, and otherwise being fully advised in the premises, the Court denies the *Motion* based upon the following Findings of Fact and Conclusions of Law.

**I.**    <u>**FINDINGS OF FACT**</u>

1.    New Mexico State Police Officer Troy Velasquez has been a commissioned police officer for six years.

2.    Officer Velasquez is currently assigned as a patrolman and to the New Mexico State Police Canine Team, as a canine handler and instructor.

3.    Officer Velasquez and Canine Kyber have been certified since 2008 by the California Narcotics Canine Association and by the United States Border Patrol Program.

4.      On August 26, 2010, Officer Velasquez was working the day shift, from six a.m. to two

        p.m., on patrol along Interstate 40 (I-40).

5.      Earlier that morning, Officer Velasquez received a call from his sergeant, Sergeant

        Ramos, indicating that Officer Velasquez should be on the lookout (BOLO) for a red

        Toyota truck with Arkansas license plates because that vehicle was possibly smuggling

        drugs.

6.      Sergeant Ramos provided a source for the information—another law enforcement

        officer—but Officer Velasquez did not write down the name of the source.

7.      Just before 10:00 a.m., Officer Velasquez was traveling westbound on I-40, heading

        toward Gallup, New Mexico, to pick up his partner.

8.      At that time, near the 38th mile-marker, he observed a small red truck traveling

        eastbound, passing a commercial vehicle.

9.      Officer Velasquez observed that the red truck was a Nissan, but he could not see the

        license plate.

10.     Officer Velasquez' patrol vehicle is equipped with a radar device, which he has been

        trained to use and which has been verified for accuracy.

11.     Officer Velasquez used the radar device to lock and verify the speed of the red truck at

        81 miles per hour.

12.     The posted speed limit was 75 miles per hour.

13.     After locking the radar, Officer Velasquez entered the median, waited for traffic to pass,

        and entered the eastbound lanes when it was safe to do so.

14.     At this time, the red truck had slowed down; Officer Velasquez paced it at 60 miles per

        hour.

15.     Officer Velasquez engaged his emergency equipment, and at the same time, the video equipment in the vehicle began recording, capturing one minute prior to the activation of the lights.

16.     The video recording timestamp indicates that the lights were engaged at 10:01 a.m.[1]

17.     The red truck pulled to the side of the road, followed by Officer Velasquez.

18.     Officer Velasquez provided dispatch with his location and a description of the truck as a red, single-cab Nissan, with Arkansas plates.

19.     Officer Velasquez testified that by this point in the day, he had forgotten about the BOLO provided by Sergeant Ramos.

20.     The Court finds that Officer Velasquez testified credibly regarding the circumstances of the stop.

21.     At the hearing, Officer Velasquez identified Defendant as the driver of the red truck.

22.     Officer Velasquez approached the truck from the passenger side, showed the driver the locked radar reading, and asked to see the driver's license and registration.

23.     Officer Velasquez observed no visible luggage in the truck and a single key in the ignition.

24.     Defendant provided the requested documents, and Officer Velasquez observed that Defendant's hands shaking.

25.     Officer Velasquez acknowledged that drivers are often nervous during traffic stops, but Officer Velasquez testified that Defendant's nervousness did not subside during the course of the encounter.

---

[1] All time notations are according to the video time stamp.

26.     Officer Velasquez requested that Defendant accompany him to stand near the patrol car, and Defendant complied.

27.     At 10:03 a.m., Officer Velasquez finished discussing the infraction, retrieved his citation book, reviewed the paperwork, and began to issue the citation.

28.     While conducting these activities, Officer Velasquez and Defendant engaged in a casual conversation.

29.     Officer Velasquez asked about Defendant's trip, and Defendant stated that he had flown from Arkansas to Phoenix to pick up the red truck, his cousin picked him up at the airport, and then he bought some new tires.

30.     Defendant initiated a conversation about the weather, Officer Velasquez asked how long the truck had been in Phoenix.

31.     Defendant responded a little over a week and explained that his cousin was moving from Phoenix to Mexico and had come to Little Rock, Arkansas to take the red truck to Phoenix.

32.     The conversation continued, Defendant talking about his brothers in Mexico, and Officer Velasquez asking how long Defendant had owned the truck (a few months).

33.     At 10:08 a.m., Officer Velasquez received information from dispatch concerning the license plate and driver's license.

34.     Defendant continued to talk about the tires that he bought in Phoenix.

35.     At 10:10 a.m., Officer Velasquez received confirmation from dispatch that Defendant's driver's license was valid—he had some difficulty running it through the computer and asked dispatch to run the license to speed up the citation process.

36.     Officer Velasquez asked Defendant a few questions about purchasing the truck, which

Defendant answered.

37.     At 10:12 a.m., Officer Velasquez walked over to the truck, telling Defendant to "stay

right here for me, all right?"

38.     Officer Velasquez walked around the truck, reached into the open window to check the

Vehicle Identification Number (VIN).

39.     He then also checked the door VIN, and observing some paint over the door VIN, he re-

checked the window sticker.

40.     Officer Velasquez returned to the patrol vehicle at 10:13 a.m., to run the window VIN, in

order to insure both that the vehicle was not stolen and that Defendant was not a victim

of purchasing a stolen vehicle.

41.     Also at 10:13 a.m., Officer Velasquez returned Defendant's paperwork.

42.     At 10:14 a.m., Officer Velasquez explained the citation and gave Defendant his copy.

43.     At 10:15 a.m., Officer Velasquez said, "Matias, you're free to go ok!" and Defendant

began to walk away.

44.     Seconds later, Officer Velasquez called, "Matias! Hey listen, you're free to go if you

have to" and continued to ask Defendant to stay and answer some more questions.

45.     Defendant returned without direction to do so and agreed to continue talking.

46.     Throughout the preceding and subsequent conversations, Officer Velasquez addressed

Defendant in English, and Defendant responded in English.

47.     The Court finds that Defendant appropriately responded to Officer Velasquez' questions

in English and that Defendant understood and communicated effectively in English.

48.     During the ensuing conversation, Officer Velasquez did not observe any signs that

Defendant was under the influence of drugs or alcohol, nor did Officer Velasquez note

any apparent physical or mental difficulties.

49.     Defendant did not complain or report any physical difficulties or that he needed

assistance.

50.     Between 10:15 a.m. and 10:23 a.m., Officer Velasquez and Defendant continued to

discuss Defendant's travel plans.

51.     At 10:23 a.m., Officer Velasquez asked whether Defendant was responsible for

everything in the truck, whether there were any weapons in the truck, and large sums of

cash, and marijuana, cocaine, heroin, or methamphetamine.

52.     Defendant responded that he was responsible for the contents of the truck and that he had

none of the things listed—in particular, when Officer Velasquez asked about drugs,

Defendant responded "I don't use none of that stuff."

53.     At 10:24 a.m., Officer Velasquez asked whether he could search Defendant's  truck.

54.     Defendant answered, "yes," in English.

55.     Prior to requesting consent to search, Officer Velasquez made the following

observations:  Defendant had a single vehicle key; the truck was recently insured;

Defendant had no visible luggage; his travel plans involved a very short trip with a great

deal of travel time; on arrival in Phoenix, Defendant immediately purchased tires;

Defendant left a known source city at 3:00 a.m.; it is well known that the Arizona

Department of Public Safety does not have a graveyard shift; Defendant did not know the

name of the cousin who borrowed the truck and picked Defendant up at the airport;

Defendant told Officer Velasquez that the cousin's phone number was in his cell phone,

but there were no numbers programmed into the prepaid disposable phone; Defendant

chewed gum fast, was overly friendly, talked a lot, and appeared nervous during the

entire encounter.

56.   After Defendant verbally consented to search, Officer Velasquez retrieved a New Mexico

Department of Public Safety consent to search form from his patrol vehicle.

57.   Officer Velasquez filled out the consent form, handed it to Defendant, and observed

Defendant reading the form.

58.   Department policy requires the officers to ask whether the subject prefers to read in

Spanish or in English.

59.   The English-language version of the form states:

> I _____, HEREBY GRANT MY CONSENT TO
> _____, OFFICERS OF THE NEW MEXICO DEPARTMENT OF
> PUBLIC SAFETY, TO SEARCH THE FOLLOWING VEHICLE DESCRIBED
> BELOW INCLUDING LUGGAGE, CONTAINERS, AND CONTENTS
> THEREIN.  IF SEARCH REVEALS A FALSE OR ALTERED
> COMPARTMENT, ACCESS TO SUCH COMPARTMENT WILL BE MADE
> BY ANY MEANS AVAILABLE; INCLUDING DRILLING AND/OR
> CUTTING OF COMPARTMENTS.

60.   Officer Velasquez told Defendant to sign "Number 1," if he agreed to the search.

61.   Defendant signed the Spanish-language consent form.

62.   Officer Velasquez testified that the Spanish-language consent form is authorized by the

Department of Public Safety, that Defendant did not ask any questions about the form or

the search, and that if Defendant had questions, Officer Velasquez would have had

someone who speaks Spanish answer the questions.

63.   Officer Velasquez requested that dispatch send another officer to the location, pursuant to

department policy that officers do not search vehicles alone.

64.   Dispatch sent the only available officer, a supervisor, Sergeant Huffman.

65.   Officer Velasquez asked Defendant to move 30-45 feet away from the red truck and the

patrol vehicle, for officer safety reasons and because Officer Velasquez was preparing to deploy Kyber.

66.    Officer Velasquez informed Defendant to "stay right here for me, if you need me, holler at me."

67.    Defendant did not call out to Officer Velasquez at any time during the search, nor did he communicate any limits on the scope of the search.

68.    Prior to running Kyber around a vehicle, Officer Velasquez completed a pre-search ritual, during which he inspected the vehicle for potential hazards to the dog, including liquids, nails, or glass.

69.    Officer Velasquez testified that he length of the pre-search ritual varies, depending the car and the circumstances; in the present case approximately 23 minutes elapsed between the initiation of the pre-search ritual and the end of the dog search.

70.    During the pre-search ritual, Officer Velasquez observed some tooling on the vehicle, and he removed the items from the back of the truck bed so as to prevent injury to Kyber.

71.    At 10:46 a.m., Officer Velasquez introduced Kyber to the truck, and at 10:48, the dog search concluded.

72.    Officer Velasquez testified that Kyber is trained to detect marijuana, cocaine, heroin, and methamphetamine.

73.    When Kyber detects one of these substances, he is trained to respond in one of two ways.

74.    The first is an "indication," which means that Kyber recognizes an odor, traces that odor to source, and sits; an "indication" is the "final trained behavior."

75.    The second response is an "alert," which means that Kyber changed his body posture or

increased his respiration in response to first encountering an odor he is trained to detect, but that he could not pinpoint the odor to source for some reason.

76.     Officer Velasquez testified that Kyber alerted to the interior of the vehicle, the bed of the truck, and the contents that had been removed from the bed of the truck.

77.     Kyber alerted by switching from breathing through his mouth to breathing through his nose, as well as by moving to the interior of the truck without direction.

78.     Officer Velasquez returned Kyber to the police vehicle and continued to search the items that had been in the back of the truck.

79.     Officer Velasquez did not open any containers until after Kyber alerted.

80.     He noticed that an air compressor had after-market modifications, including paint discoloration between the motor and the air compressor, as if  the compressor had been sanded, and spray-foam filling a drain plug that led to a normally empty chamber inside the air compressor.

81.     Because Officer Velasquez could not see into the chamber through the drain plug, he removed the motor, revealing fresh Bondo (a body filler used in auto repair) on the top of the air compressor.

82.     The Bondo was still soft—it had not yet set and cured.

83.     Officer Velasquez testified that the air compressor would not function as designed in the condition that it was found.

84.     When Officer Velasquez located the Bondo, he called his supervisor, Lieutenant Mora, who advised Officer Velasquez to open the air compressor.

85.     After scraping off some of the Bondo, Officer Velasquez inserted a fibre optic scope into the drain plug opening, and he was able to see more spray foam, as well as an access

door, which indicated that the air compressor had a false compartment.

86.     Eventually, 16 wrapped bundles were found inside the air compressor.

87.     There is no dispute that the wrapped bundles contained methamphetamine.

88.     The Court finds that at all times during the encounter, Officer Velasquez was in uniform, carried weapons but did not brandish or display them, made no threats, was not aggressive, and maintained a conversational and pleasant tone when speaking with Defendant.

89.     Defendant was arrested one hour and 32 minutes into the encounter.

90.     On September 16, 2010, Defendant was indicted on one count of possession with intent to distribute methamphetamine contrary to 18 U.S.C. § 841(a)(1) and (b)(1)(A).

## II.    CONCLUSIONS OF LAW

Defendant challenges the stop from its inception, the continued questioning after the issuance of the citation, the scope of the search conducted, and the length of the detention.  Each issue is addressed in turn.

"A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'"  United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998) (quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979)).  To determine the reasonableness of an investigative detention, the Court conducts a two-part inquiry, asking first whether the officer's action was justified at its inception and second, whether it was reasonably related in scope to the circumstances justifying the interference in the first place.  See Hunnicutt, 135 F.3d at 1348.

A traffic stop is "justified at its inception" when the initiating officer had "a reasonable articulable suspicion that a traffic or equipment violation ha[d] occurred or [was] occurring." Id. at 1348.  During the course of a lawful investigatory stop, a police officer "may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.'" Arizona v. Johnson, 129 S.Ct. 781, 786 (2009) (quoting Pennsylvania v. Mimms, 434 U.S. 106, 111, n. 6 (1977)).  In order to investigate a perceived traffic violation, the officer may request a driver's license, vehicle registration and other required papers, run necessary computer checks, and then issue any warning or citation.  See United States v. Gregoire, 425 F.3d 872, 879 (10th Cir. 2005).  Once those tasks are completed, however, a driver must be allowed to proceed on his way unless (1) reasonable suspicion exists that the driver is engaged in criminal activity or (2) the driver consents to additional questioning.  Id.

Whether consent is given is a question of fact, determined by the totality of the circumstances.  United States v. Silva-Arzeta, 602 F.3d 1208, 1213 (10th Cir. 2010). "The central question is whether a reasonable person would believe he was free to . . . disregard the officer's request."  Id. at 1214(alteration in original) (internal quotation marks and citation omitted).   This inquiry focuses on whether "the defendant suffered, inter alia, physical mistreatment, use of violence or threats of violence, promises or inducements, deception or trickery."  Id. at 1214 (internal quotation marks and citation omitted).  Further, "a defendant's consent to a search may be voluntary even when the consenting party was not informed he could refuse."  United States v. Carbajal-Iriarte,

586 F.3d 795, 799 (10th Cir. 2009).

"When law enforcement officers rely upon consent as the basis for a warrantless search, the scope of the consent determines the permissible scope of the search." United States v. Osage, 235 F.3d 518, 519-20 (10th Cir. 2000). The scope of the consent is "measured by objective reasonableness: what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Id. at 520 (internal quotation marks and citation omitted). "A general grant of permission to search an automobile typically extends to the entire car, absent an objection or an explicit limitation by the grantee." United States v. Rosborough, 366 F.3d 1145, 1150 (10th Cir. 2004). With these principles in mind, I turn to Defendant's challenges to the stop, the search, and the detention.

## A.      **The Stop**

Defendant contends that the Court should not rely on any information given by Sergeant Ramos to Officer Velasquez in the early-morning BOLO in order to find that the stop was justified at its inception. The Court does not consider the BOLO report because Officer Velasquez credibly testified that he did not stop Defendant based on the BOLO, but instead because he had probable cause that Defendant committed a traffic violation. See Whren v. United States, 517 U.S. 806, 813, 819 (1996) (noting that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis" and affirming the district court's ruling that a stop was reasonable where the officer had probable cause to believe that the defendant had violated the traffic code).

Rather than relying on the BOLO, the Court finds that the stop was justified at its inception because Officer Velasquez credibly testified that Defendant was traveling in excess of the posted speed limit.  See United States v. Winder, 557 F.3d 1129, 1135 (10th Cir. 2009) ("Once an officer observes a traffic or equipment violation, a Terry stop is objectively justified, regardless of the detaining officer's subjective motives." (internal quotation marks and citation omitted)).  There is no dispute that Defendant was traveling six miles per hour over the speed limit.  Accordingly, Officer Velasquez observed a traffic violation and therefore, had probable cause to initiate the traffic stop.  See United States v. Jackson, 235 Fed.Appx. 707, 710 (10th Cir. 2007) (holding a stop to be justified where the trooper "clocked the defendants' vehicle traveling seventy-nine miles per hour in a seventy-five mile-per-hour speed zone" because even though the violation was "a relatively minor violation of Wyoming's traffic laws," it remained "a violation nonetheless").

**B.**      **Post-Citation Encounter**

Defendant next argues that after the purpose for the stop was fulfilled by the issuance of a citation, Officer Velasquez impermissibly extended the stop, without consent or reasonable suspicion.  Specifically, Defendant argues that (1) Officer Velasquez did not develop reasonable suspicion of further criminal activity during the issuance of the speeding citation, which would justify additional questioning and (2) he did not consent to additional questioning, because he did not feel free to leave.  Further, Defendant maintains that even if the detention was initially consensual, the subsequent

questioning and search exceeded the scope of the original consent. Last, Defendant

contends that the overall length of the detention was unreasonable.

**1.     Consent to Additional Questioning**

With regard to the additional questioning, Defendant simply states that he "did not

feel as if he was free to leave and disregard the officer's authority." [Doc 26 at 12]

Despite this statement regarding his subjective state of mind, Defendant fails to consider

the relevant factors that have been identified by our Circuit. Specifically, this Court

considers the totality of the circumstances, including

> the location of the encounter . . .; whether the officers touch or physically
> restrain the defendant; whether the officers are uniformed or in plain
> clothes; whether their weapons are displayed; the number, demeanor and
> tone of voice of the officers; whether and for how long the officers retain
> the defendant's personal effects such as tickets or identification; and
> whether or not they have specifically advised defendant at any time that he
> had the right to terminate the encounter or refuse consent.

Carbajal-Iriarte, 586 F.3d at 801 (alteration in original) (internal quotation marks and

citation omitted). In the present case, the encounter took place in public, on the side of

the road. Silva-Arzeta, 602 F.3d at 1214, 1215 (one factor reducing possibility of

intimidation is that encounter occurs in public setting). The Court has found that Officer

Velasquez did not touch or restrain Defendant, that no weapons were brandished or

displayed, and that Officer Velasquez did not raise his voice or use derogatory or

inflammatory language. Defendant's documents and personal effects were returned to

him with the traffic citation, approximately 12 minutes into the stop and prior to the

request to search.  Further, at the beginning of the additional questioning, Officer

Velasquez informed Defendant that he was free to leave.  Based on these circumstances,

the Court finds that Defendant consented to answer additional questions.

Defendant maintains that when Officer Velasquez told Defendant to "stand right

there," any consent that may have existed vanished because "[n]o reasonable person

would have believed they could disregard the officer's order to 'stand right [t]here.'"

[Doc 26 at 14]  Defendant, however, has omitted the context for Officer Velasquez's

statement.  Officer Velasquez told Defendant where to stand after Defendant had

consented, verbally and in writing, to the search of the truck.  [Id. at 4]  Further, Officer

Velasquez employed no force or harsh language.  After Defendant signed the consent

form, Officer Velasquez said:  "come over here, come over here," and led Defendant

away from the truck.  Officer Velasquez then said "stay right here for me, if you need me,

holler at me."  [Id. at 4-5]  Officer Velasquez credibly testified that he led Defendant

away from the truck and told him to stay for officer safety reasons and to keep Defendant

safe.  Officer Velasquez did not exceed the scope of the consent or transform the

consensual encounter into a detention by asking Defendant to stand away from the truck.

**2.**     **Consent to Search the Truck**

Next, Defendant maintains that the search of the truck elevated the encounter into

a detention because it exceeded the scope of consent on three grounds.  First, Defendant

argues that after searching the truck, Officer Velasquez discovered nothing to substantiate

bringing in the drug dog.  Second, Defendant contends that when the dog alerted to the

interior, the officers should not have continued to search other parts of the truck  Third, Defendant challenges the scope of the Spanish-language consent form and argues that the Spanish form does not permit the same breadth of search that is allowed in the English-language form.

Taking up the first objection, there is no evidence that Officer Velasquez specifically asked Defendant for consent to deploy the dog.  Nevertheless, the vehicle was lawfully detained because Defendant consented to the search of the truck.  "[C]onsent is not required for a dog sniff of a lawfully detained vehicle."  United States v. Robinson, 16 Fed.Appx. 966, 971 (10th Cir. 2001) (internal quotation marks and citation omitted) (citing United States v. Chavira, 95 F.3d 888, 890, n.1 (10th Cir. 1993)).  Thus, because Defendant volunteered to continue the encounter (which he did by signing the consent forms and verbally consenting to search), additional and specific consent to the dog sniff was not required.  Further, our Circuit has noted that although consent is not required to deploy a dog around a lawfully detained vehicle, consent is required "for continued detention beyond the lawful period."  Id.  Officer Velasquez deployed Kyber at 10:46 a.m. and he completed his round of the truck at 10:48 a.m..  The Court finds that the two-minute search did not extend beyond the lawful period.

Defendant's second point lacks merit.  He asserts that the officers wrongfully continued to search the pickup bed, the contents of the bed, and the air compressor because the dog alerted to the interior of the truck.  It is well established, however, that a "dog alert creates general probable cause to search a vehicle; it does not implicate the

precision of a surgeon working with scalpel in hand." <u>Rosborough</u>, 366 F.3d at 1153.

Thus, "a canine alert toward the passenger area of a vehicle gives rise to probable cause

to search the trunk as well." <u>Id.</u>  As a result, after Kyber alerted to any part of the car,

Officer Velasquez had probable cause to search the entire vehicle, including the air

compressor.  <u>See id.</u> at 1148, 1153 (holding that the officers had probable cause to

remove the carpeting in the trunk to search underneath even though the dog alerted to the

front passenger area); <u>United States v. Lyons</u>, 520 F.3d 1225, 1241 (10th Cir. 2007)

(holding that a defendant's "consent to 'look in the back' rendered the entire rear portion

of [the defendant's] vehicle, including the rear part of its undercarriage and the spare tire

attached thereto, fair game for all that might be revealed to the senses[, and] it may have

extended further").

Finally, Defendant challenges the consent form, arguing that the Spanish-language

form did not authorize to the same scope of consent as the English language form.

Defendant's maintains that the English consent form authorizes a search of "luggage,

containers, and contents therein," and the Spanish consent form contains no equivalent to

"containers and contents therein."  [<u>Id.</u> at 4]  As a result, Defendant argues, because he

signed the Spanish form, he did not consent to the search of containers and their contents,

including the air compressor.  [<u>Id.</u> at 14-15] It is not necessary for this Court to address

this alleged discrepancy in the meaning of the words as between the English and Spanish

forms, because Officer Velasquez credibly testified that he did not open any containers in

the truck until after Kyber's alert.  Thus, by the time the officers searched the air

compressor and the other containers, where the drugs were found, they had probable cause based on Kyber's alert.  Consent to search the air compressor was not required.

Further, despite the cases cited by Defendant that require consent to an expanded search—and he claims this search was "expanded" due to the deficiencies in the Spanish consent form—our Circuit has held that "[a] general grant of permission to search an automobile typically extends to the entire car, absent an objection or an explicit limitation by the grantee."  Rosborough, 366 F.3d  at 1150.  Defendant does not argue that he limited the scope of his consent or even that Officer Velasquez intimated that the search would be quick and narrow.  In addition, Defendant does not argue that he objected when Officer Velasquez began to open containers.  United States v. Marquez, 337 F.3d 1203, 1207 (10th Cir. 2003) ("[A]bsent an objection by the suspect, an officer does not exceed the scope of a suspect's consent if his consent would reasonably be understood to extend to a particular container." (internal quotation marks and citation omitted)).  As the English-language version of the form led Officer Velasquez to believe that Defendant had consented to a general search, absent objection from Defendant, he reasonably conducted such a search.

**3.      Length of Detention And Search**

Defendant last contends that the "overall length of this seizure . . . is arguably presumptively unconstitutional."  [Doc 32 at 4]  "There is no absolute rule specifying the permissible duration of a search performed with the defendant's consent." Carbajal-Iriarte, 586 F.3d at 801 (internal quotation marks and citation omitted).  Instead, this

Court considers "what a reasonable person would have understood to be the scope and duration of his consent under the circumstances."  Id.  In Carbajal-Iriarte, the defendant challenged a search that spanned two hours and took place in two separate locations.  Id. at 802.  In that case, the officers initially approached the defendant at a truck stop, located 50 miles west of Albuquerque.  Id. at 797.  The defendant consented to questioning by the officers and eventually, he permitted them to search his vehicle.  Id. at 798.  The officers located no contraband, but were nevertheless concerned about discrepancies in the defendant's story.  Id.

The officers asked the defendant whether he would be willing to follow them to Albuquerque, "to meet other officers so they could conduct a more thorough search of the vehicle."  Id. The defendant agreed, and the group headed toward Albuquerque, with the officers following the defendant, with the emergency lights disengaged.  Id.  After twenty miles, the group approached another officer, sitting in the median with his emergency lights engaged.  Id.  The officers following the defendant engaged their lights and the group pulled over.  Id.  The officers asked for permission to walk the drug dog around the defendant's car—the dog had been transported in the interim—and the defendant consented. Id. at 798-99.

Our Circuit held that the search did not exceed the duration of the defendant's consent.  Id. at 802.  The Court described the events and the defendant's consent as follows:

> The first search at the truck stop lasted approximately half an hour, after which [the defendant] agreed to go with Agent Small and Detective Tate to meet Officer Ramos for a second search. After arriving at Officer Ramos's location along Interstate 40, [the defendant] reaffirmed his consent for the search. From the time of [the defendant]'s last consent, the search lasted just over an hour, only slightly longer than the search at issue in <u>Rosborough</u>. Once Officer Ruiloba arrived with the drug dog, the dog alerted to the presence of methamphetamine within a matter of minutes.

<u>Id.</u> at 802.  From this, the Court concluded that the fact that the defendant "repeatedly consented to these searches favors the conclusion that the duration of the search was reasonable."  <u>Id.</u>

In the present case, the evidence at the hearing demonstrates that Officer Velasquez approached the vehicle at 10:01 a.m., and that the speeding ticket was issued at 10:14 a.m.  [Doc 26 at 1-3]  Officer Velasquez asked to search at 10:24 a.m., Kyber alerted at 10:47 a.m., and the officers opened the air compressor approximately an hour into the stop.  Defendant was arrested 93 minutes after the traffic stop began.  [<u>Id.</u> at 4-5] From the time that the consent was signed until dog alerted—thereby generating probable cause to continue to search—23 minutes elapsed.

Defendant's consent contained no limitation on the duration of the search—which amounts to "general permission to search the vehicle."  <u>Id.</u>  Defendant suggests he could not have narrowed or limited his consent because he was asked to stand away from the truck during the search, but Officer Velasquez told Defendant to "holler" at him, if he needed anything.  [Doc 32 at 4]  Officer Velasquez did not force Defendant or use harsh or strict language.  Officer Velasquez did not create "the understanding that the search

would be brief." Id.  Although Defendant implies or suggests that the officers did not act with due diligence, he points to no particular conduct that would support a finding that Officer Velasquez impermissibly dallied or purposefully delayed the search.

**III.     CONCLUSION**

Defendant does not argue that he was coerced into signing the consent form or that his verbal consent to search was invalid.  There is no indication that Defendant objected to the search at any stage.  For these reasons and those stated more fully above, the Court concludes that Defendant consented to additional questioning and the search of his truck. The Court further concludes that once Kyber alerted to the vehicle, Officer Velasquez had probable cause to conduct a thorough search of the truck and its contents.

**IT IS THEREFORE ORDERED** that *Defendant Matias Baldenegro's Motion To Suppress Evidence Seized In Violation Of The Fourth Amendment* [Doc 26] is **DENIED**.

**SO ORDERED** this 17th day of June, 2011, in Albuquerque, New Mexico.


M. CHRISTINA ARMIJO
United States District Judge

.